# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 03-1331, 03-1461

NEIL GAIMAN and MARVELS AND MIRACLES, LLC,

*Plaintiffs-Appellees/Cross-Appellants*,

*v.*

TODD MCFARLANE, *et al.*,

*Defendants-Appellants/Cross-Appellees*.
_____

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 02-C-48—**John C. Shabaz**, *Judge*.
_____

ARGUED JANUARY 5, 2004—DECIDED FEBRUARY 24, 2004
_____

Before POSNER, KANNE, and ROVNER, *Circuit Judges*.

POSNER, *Circuit Judge*.  Neil Gaiman brought suit under the Copyright Act against Todd McFarlane and corporations controlled by him that we can ignore, seeking a declaration that he (Gaiman) owns copyrights jointly with McFarlane in certain comic-book characters. *Merchant v. Levy*, 92 F.3d 51 (2d Cir. 1996); *Zuill v. Shanahan*, 80 F.3d 1366 (9th Cir. 1996); *Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 161 F.2d 406 (2d Cir. 1946). He sought additional relief under the Act, other provisions of federal law, and state law, as

well. The case was tried to a jury, which brought in a verdict for Gaiman. The judge entered a judgment that declared Gaiman to be the co-owner of the characters in question, ordered McFarlane to so designate Gaiman on undistributed copies in which these characters appear, provided modest monetary relief in respect of Gaiman's supplemental claim for damages for breach of his right of publicity, and ordered an accounting of the profits that McFarlane has obtained that are rightfully Gaiman's. The accounting is not yet complete, and so the judgment is not final; McFarlane's appeal is therefore limited to the injunction requiring him to acknowledge Gaiman's co-ownership.

McFarlane contends that a reasonable jury would not have rejected his statute of limitations defense and that in any event two of the comic-book characters at issue are not copyrightable. The parties agree that the alternative defense, the defense of uncopyrightability, is strictly an issue for the court. We have found only a handful of appellate cases addressing the issue, and they are split. *Matthew Bender & Co. v. West Publishing Co.*, 158 F.3d 674, 681 (2d Cir. 1998), and *North Coast Industries v. Jason Maxwell, Inc.*, 972 F.2d 1031, 1035 (9th Cir. 1992), hold that copyrightability is a mixed question of law and fact, at least when it depends (as it usually does) on originality, and that it is therefore an issue for the jury or other factfinder. But *Yankee Candle Co. v. Bridgewater Candle Co.*, 259 F.3d 25, 34 n. 5 (1st Cir. 2001), and our own *Publications Int'l, Ltd. v. Meredith Corp.*, 88 F.3d 473, 478 (7th Cir. 1996), along with a number of district court cases, e.g., *Collezione Europa U.S.A., Inc. v. Hillsdale House, Ltd.*, 243 F. Supp. 2d 444, 451-52 (M.D.N.C. 2003); *Newton v. Diamond*, 204 F. Supp. 2d 1244, 1253 (C.D. Cal. 2002), hold that copyrightability is always an issue of law. Whether a particular work is copyrightable is fact-specific, which argues against treating the question as one of law, but tugging the other way is the concern that property

rights not be placed at the mercy of a jury. A nice issue, but this is not an apt occasion on which to reexamine our resolution of it in *Publications Int'l*.

Gaiman's cross-appeal, in which he is joined by a company controlled by him, is from the dismissal of his auxiliary claim for breach of contract. The cross-appeal is contingent on our reversing the copyright judgment, since Gaiman seeks no additional relief on his contract claim; it's just a backstop to his copyright claim.

We need to do some stage setting. Gaiman and McFarlane are both celebrated figures in the world of comic books, but they play different though overlapping roles. Gaiman just writes scripts; McFarlane writes scripts too, but he also illustrates and publishes the comic books. In 1992, shortly after forming his own publishing house, McFarlane began publishing a series of comic books entitled *Spawn*, which at first he wrote and illustrated himself. "Spawn," more precisely "Hellspawn," are officers in an army of the damned commanded by a devil named Malebolgia, who hopes one day to launch his army against Heaven. The leading character in the series is a man named Al Simmons, who is dead but has returned to the world of the living as a Hellspawn.

Al's story is an affecting one. Born in a quiet neighborhood outside of Pittsburgh, he was recruited by the CIA and eventually became a member of an elite military unit that guards the President. He saved the President from an assassin's bullet and was rewarded with a promotion to lieutenant colonel. He was placed under the command of Jason Wynn, who became his mentor and inducted him into the sinister inner recesses of the intelligence community. When Al began to question Wynn's motives, Wynn sent two agents, significantly named Chapel and Priest, to kill Al with laser weapons, and they did, burning him beyond

recognition. Al was buried with great fanfare in Arlington National Cemetery.

Now Al had always had an Achilles' heel, namely that he loved his wife beyond bearing and so, dying, he vowed that he would do anything to see her again. Malebolgia took him at his word ("would do anything" and returned Al to Earth. But a deal with the devil is always a Faustian pact. Al discovered that he was now one of Malebolgia's handpicked Hellspawn and had been remade (a full makeover, as we'll see) and infused with Hell-born energy.

Returned to Earth in his new persona, Al discovers that his wife has remarried his best friend, who was able to give her the child he never could. He absorbs the blow but thirsts for revenge against Jason Wynn. He bides his time, living with homeless people and pondering the unhappy fact that once he exhausts his Hell-born energy he will be returned to Malebolgia's domain and become a slave in an army of the damned with no hope of redemption. He must try somehow to break his pact with the devil.

The early issues in the series were criticized for bad writing, so McFarlane decided to invite four top writers each to write the script for one issue of *Spawn*. One of those invited was Gaiman. He accepted the invitation and wrote the script for *Spawn* issue No. 9. Their contract, made in 1992, was oral. There was no mention of copyright, nor, for that matter, of how Gaiman would be compensated for his work, beyond McFarlane's assuring Gaiman that he would treat him "better than the big guys" did. The reference was to the two leading comic book publishers, Marvel Comics (not to be confused with Gaiman's company, Marvels and Miracles) and DC Comics, for which Gaiman and other writers write on a "work made for hire" basis. 17 U.S.C. § 101. This means that the publishers own the copyrights on their work.

§ 201(b).

It might seem that when McFarlane told Gaiman that he would treat Gaiman "better than the big guys" did, he just meant he'd compensate him more generously for work made for hire. But McFarlane rightly does not argue this. Gaiman's work for him was not work made for hire. It was neither (1) work created by an employee within the scope of his employment nor (2) "a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101. There was no written agreement between Gaiman and McFarlane, and Gaiman was not an employee of McFarlane.

Now it is true that a commissioned work not falling under (2) may be deemed a work for hire under (1) if, for example, the commissioning party pays the author a monthly stipend, pays health and other fringe benefits during the time the author works on the project, and exercises overall though not necessarily daily supervision. See *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 750-52 (1989); *Saenger Organization, Inc. v. Nationwide Ins. Licensing Associates, Inc.*, 119 F.3d 55, 59-60 (1st Cir. 1997). The work for hire concept isn't limited to formal employment because a functionally identical relationship can be created by skillful drafting of contracts that purport to treat the (de facto) employee as an independent contractor. The work for hire provision is not unique in sensibly forgoing a definition of "employee" or "employment" and by doing so empowering the courts to define these terms from case to case on a practical rather than formal basis, using the principles of agency law to

prevent evasion of the statutory purpose. E.g., *Clackamas Gastroenterology Associates, P.C. v. Wells*, 123 S. Ct. 1673 (2003); *EEOC v. Sidley Austin Brown & Wood*, 315 F.3d 696, 704-07 (7th Cir. 2002). But there is nothing to suggest that Gaiman ever became a de facto employee of McFarlane. And while Gaiman could have assigned to McFarlane his copyright in any work he did under the oral contract, copyright assignments must be in writing, 17 U.S.C. § 204(a); *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 413 (7th Cir. 1992), and there was no written assignment.

In his script for *Spawn* No. 9, Gaiman introduced three new characters—Medieval Spawn (as he was later called by McFarlane—Gaiman had not named it and in the issue he is just referred to as a Spawn, with no further identifier), Angela (no last name), and Count Nicholas Cogliostro. Gaiman described, named, and wrote the dialogue for them, but McFarlane drew them. Gaiman contends that he and McFarlane are joint owners of the copyrights on the three characters by reason of their respective contributions to joint (indivisible) work. 17 U.S.C. § 101; *Seshadri v. Kasraian*, 130 F.3d 798, 803-04 (7th Cir. 1997); *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1067-72 (7th Cir. 1994); *Thomson v. Larson*, 147 F.3d 195, 199-205 (2d Cir. 1998). McFarlane concedes Gaiman's joint ownership of Angela, but not of the other two; we postpone our consideration of the issue until we have disposed of the statute of limitations defense, to which we now turn. Evaluation of the defense requires us to consider a chain of events running from 1992—when the contract was made and *Spawn* No. 9, which states on its inside cover that it is copyrighted by McFarlane (actually by one of his companies, but that is immaterial), was published—to 1999.

*Spawn* No. 9 was a huge success, selling more than a million copies. McFarlane paid Gaiman $100,000 for his work

on it. Gaiman testified that this was about what he would have expected to receive from DC Comics had he written the script of *Spawn* No. 9 for that company as a work made for hire.

Because Angela was a big hit with *Spawn's* readers, McFarlane asked Gaiman to do a "mini-series" of three issues starring her, which he did. He also wrote several pages for *Spawn* No. 26 to form a bridge to the *Angela* series. Because Angela hadn't appeared in *Spawn* Nos. 10 through 25, Gaiman was concerned that readers would not realize that *Angela* was an offshoot of *Spawn*. McFarlane paid Gaiman $3,300 for his contribution to *Spawn* No. 26 and more than $30,000 (the exact amount is not in the record) for the *Angela* series. Only one of these four issues (the second *Angela*) contains a copyright notice; the notice is similar to the one in *Spawn* No. 9.

The *Angela* series was first published in 1994. The following year, having created a toy company to manufacture statuettes ("action figures") of *Spawn* characters, one a statuette of Medieval Spawn, McFarlane mailed Gaiman a check for $20,000 designated as royalties, presumably on sales of the statuette, though the record is unclear.

McFarlane subsequently licensed the publication of paperback books that reprinted the comic books to which Gaiman had contributed. The books carry a copyright notice similar to the one in *Spawn* No. 9 and *Angela* No. 2 except that it adds that "all related characters" are also copyrighted by McFarlane. Besides inserting the copyright notices that we've mentioned, McFarlane applied to the Register of Copyrights for, and received, copyright registrations on these issues and books.

In 1996, learning that McFarlane might sell his enterprise, Gaiman decided that he needed the protection of a writ-

ten contract and he asked McFarlane for one. McFarlane agreed to give him a written contract and also to pay him royalties for a statuette of Angela that McFarlane's toy company had manufactured and sold.

After desultory negotiations, Gaiman's lawyer wrote a letter to McFarlane's negotiator stating that Gaiman had created the characters of Medieval Spawn, Angela, and Cogliostro not as work for hire but "pursuant to the terms of an oral agreement under which Mr. McFarlane agreed that Mr. Gaiman would be compensated on the same terms as set forth in Mr. Gaiman's DC Comics Agreements dated August 1, 1993." This was a surprising interpretation of the oral agreement, since in it McFarlane had promised to treat Gaiman *better* than DC Comics treated him; but as nothing turns on this interpretation we'll ignore it. The letter goes on to "demand" that McFarlane "immediately forward all monies which are currently owed to Mr. Gaiman in accordance with the terms of the DC Agreement." We'll call this the demand letter.

Direct negotiations between Gaiman and McFarlane ensued. A tentative agreement was reached that McFarlane would pay royalties on the statuettes on the same terms as Gaiman would have gotten from DC Comics but that Gaiman would exchange his rights in Medieval Spawn and Cogliostro for McFarlane's rights in another comic book character, Miracleman. Once the exchange was made, Gaiman would no longer receive royalties on Medieval Spawn and Cogliostro.

For the rest of 1997 and 1998, McFarlane sent Gaiman royalty checks totaling about $16,000, presumably on account of the statuettes and the paperback books, together with royalty reports that referred to Gaiman as a "co-creator" of Medieval Spawn, Angela, and Cogliostro. On February 14, 1999, however, Gaiman received a letter from

McFarlane announcing that McFarlane was "officially re-scind[ing] any previous offers I have placed on the table." The letter offered Gaiman the following deal on a take-it-or-leave-it basis: Gaiman would relinquish "all rights to Angela" in exchange for "all rights to Miracle Man," and "all rights to Medieval Spawn and Cogliostro shall continue to be owned by Todd McFarlane Productions."

The statement "all rights to Medieval Spawn and Cogliostro shall continue to be owned by Todd McFarlane Productions" was an unambiguous denial of Gaiman's copyright interest and therefore is the last date on which his claim could have accrued and the three-year copyright statute of limitations, 17 U.S.C. § 507(b), thus have begun to run. This suit was brought in January of 2002—a month short of three years after Gaiman's receipt of McFarlane's letter. By the time of trial, *Spawn* was up to issue No. 120 and had spawned a large number of derivative works, including posters, trading cards, clothing, the statuettes, an animated series on HBO, video games, and a motion picture. Many of these derivative works include all three characters to which Gaiman contributed, so that the financial stakes in the case are considerable.

A minor wrinkle concerning the statute of limitations defense is that Gaiman's suit is not a suit for infringement. Gaiman concedes that McFarlane also owns copyright in the comic-book characters in issue. The claim rejected by McFarlane is that Gaiman is a co-owner, along with McFarlane. 17 U.S.C. § 201(a). As a co-owner, McFarlane was not violating the Copyright Act by unilaterally publishing the jointly owned work, but, as in any other case of conversion or misappropriation, he would have to account to the other joint owner for the latter's share of the profits. *Zuill v. Shanahan, supra,* 80 F.3d at 1369. When co-ownership is conceded and the only issue therefore is the contractual,

or in the absence of contract the equitable, division of the profits from the copyrighted work, there is no issue of copyright law and the suit for an accounting of profits therefore arises under state rather than federal law. *Goodman v. Lee*, 78 F.3d 1007, 1013 (5th Cir. 1996); *Oddo v. Ries*, 743 F.2d 630, 633 and n. 2 (9th Cir. 1984); *Mountain States Properties, Inc. v. Robinson*, 771 P.2d 5, 6-7 (Colo. App. 1988). It is just like a suit to enforce a copyright license, which arises under state law rather than under the Copyright Act. *Saturday Evening Post Co. v. Rumbleseat Press, Inc.*, 816 F.2d 1191, 1194-95 (7th Cir. 1987); *T.B. Harms Co. v. Eliscu*, 339 F.2d 823, 824, 828 (2d Cir. 1964) (Friendly, J.); cf. *International Armor & Limousine Co. v. Moloney Coachbuilders, Inc.*, 272 F.3d 912, 915-16 (7th Cir. 2001). And in that event the applicable statute of limitations would be state rather than federal.

But more is involved in this case. As in *Zuill v. Shanahan*, *supra*, 80 F.3d at 1371, and also *Merchant v. Levy*, *supra*, 92 F.3d at 56, and *Goodman v. Lee*, 815 F.2d 1030, 1031-32 (5th Cir. 1987), Gaiman seeks a declaration that he *is* a co-owner, which depends on whether his contribution to the comic-book characters in question gave him a copyright interest. That question, on the answer to which his entitlement to an accounting and other relief depends, cannot be answered without reference to the Copyright Act, and it therefore arises under the Act. *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 199-202 (1921). As we said in *Saturday Evening Post Co. v. Rumbleseat Press, Inc.*, *supra*, 816 F.2d at 1194, "the principle that disputes over the terms of copyright licenses do not arise under federal law has an exception for cases where establishing the plaintiff's right will require interpreting federal law." One can imagine, if barely, a case in which, though federal jurisdiction would lie because a copyright issue was unavoidable, the heart of the case lay elsewhere

and a more suitable statute of limitations than the one in the Copyright Act could be found. But this is not such a case. The question whether Gaiman has a copyright is central, and the Act's three-year statute of limitations, which applies to any suit arising under the Act, and not just to a suit for infringement (for section 507(b) reads: "No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued"), is therefore, as the parties agree, clearly applicable to this case.

The parties also rightly agree that the copyright statute of limitations starts to run when the plaintiff learns, or should as a reasonable person have learned, that the defendant was violating his rights, *Taylor v. Meirick*, 712 F.2d 1112, 1117 (7th Cir. 1983), in this case by repudiating Gaiman's ownership of copyright. *Aalmuhammed v. Lee*, 202 F.3d 1227, 1230-31 (9th Cir. 2000); *Merchant v. Levy*, *supra*, 92 F.3d at 53, 56; *Zuill v. Shanahan*, *supra*, 80 F.3d at 1370-71. McFarlane claims that Gaiman knew, or certainly should have known, no later than 1997 when Gaiman's lawyer wrote the demand letter from which we quoted, that McFarlane was denying that Gaiman had any copyright interest in the three characters—that McFarlane had in effect appropriated Gaiman's copyright interest. Actually McFarlane thinks that Gaiman's copyright claim accrued a lot earlier—in 1993 when *Spawn* No. 9 was published with a copyright notice that did not mention Gaiman. It doesn't matter; if Gaiman's claim accrued before February 1999, the suit is untimely.

McFarlane's argument, however, reflects a misunderstanding of both the function of copyright notice and the nature of the copyright in a compilation. The function of copyright notice is to warn off copiers, 17 U.S.C. §§ 401(d), 405(b), 406(a); *Fantastic Fakes, Inc. v. Pickwick International, Inc.*, 661 F.2d 479, 486-87 (5th Cir. 1981); *Fleischer Studios,*

*Inc. v. Ralph A. Freundlich, Inc.*, 73 F.2d 276, 277 (2d Cir. 1934), not to start the statute of limitations running. There may be situations in which the notice just happens to put a copyright owner on notice that someone is acting in derogation of his rights. Remember that a claim inconsistent with the copyright holder's interest sets the statute running, and in particular circumstances a notice indicating that the defendant was the sole copyright holder might amount to such a claim. *Saenger Organization, Inc. v. Nationwide Ins. Licensing Associates, Inc., supra*, 119 F.3d at 66. But not when the work is a compilation, as *Spawn* No. 9 plainly is. For it contains, besides Gaiman's contributions and goodness knows who else's, a letter-to-the-editors column containing a number of signed letters from fans plus art work contributed by fans. As McFarlane concedes, the copyrights on those letters and on the art work are owned by the fans and his copyrighting the issue is not a claim to own their copyrights.

The creator of a compilation is entitled to copyright it as long as it's a work "formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101; see also § 103. The compiler's copyright entitles him to reprint the contents of the compilation in future editions of the compilation. 17 U.S.C. § 201(c); *New York Times Co. v. Tasini*, 533 U.S. 483, 493-97 (2001). But all the other rights of copyright remain in the authors of the contributions, provided the contributions satisfy the criteria of copyrightability. Therefore the compiler's copyright notice is not adverse to the contributors' copyrights and so does not put them on notice that their rights are being challenged. On the contrary, "a single copyright notice applicable to the collective work as a whole serves to indicate protection for all the contributions in the col-

lective work, except for advertisements, regardless of the ownership of copyright in the individual contributions and whether they have been published previously." United States Copyright Office, *Circular No. 3: Copyright Notice* 3 (2004); see *Sanga Music, Inc. v. EMI Blackwood Music, Inc.*, 55 F.3d 756, 759-60 (2d Cir. 1995); *Abend v. MCA, Inc.*, 863 F.2d 1465, 1469 (9th Cir. 1988), aff'd under the name *Stewart v. Abend*, 495 U.S. 207 (1990).

There is a close analogy to the doctrine of adverse possession in the law of physical property. That doctrine extinguishes the paper title if the property is occupied under an adverse claim of right for the statutory period. If the claim is not adverse, as where a tenant occupies the owner's property—or, even more to the point, where a cotenant occupies property, because a joint copyright owner *is* a cotenant, e.g., *Zuill v. Shanahan*, *supra*, 80 F.3d at 1370; *Childress v. Taylor*, 945 F.2d 500, 505 (2d Cir. 1991)—the statute of limitations does not begin to run. *Howell v. Bradford*, 570 So. 2d 643, 645 (Ala. 1990) (per curiam); *Fantasia v. Schmuck*, 395 S.E.2d 784, 786 (W. Va. 1990) (per curiam); *Evans v. Covington*, 795 S.W.2d 806, 808 (Tex. App. 1990); *Chicago, Peoria & St. Louis Ry. v. Tice*, 83 N.E. 818, 819-20 (Ill. 1908). No more does it begin to run when the claim to the copyright is a compiler's claim, because such a claim is not adverse to the contributor's copyright.

The copyright notices in the paperback books, however—notices that claim copyright for McFarlane in "all related characters"—might seem to be an example of our earlier point that there may be cases in which a copyright notice denies a contributor's copyright. But unless there is a duty of authors to read the copyright pages of works containing their copyrighted materials—and there is not—then since as we said the purpose of copyright notice is not to

affect the time within which the victim of an infringement can sue (which is *why* there is no duty of authors to study copyright notices), the notice can affect the accrual of the cause of action only if the victim reads it. The jury was entitled to believe Gaiman's testimony that he had never seen the paperback books in which the suspicious notices appeared.

In addition to the copyright notices, McFarlane registered copyright on the issues and the books. But to suppose that by doing so he provided notice to Gaiman of his exclusive claim to the characters is again untenable. Authors don't consult the records of the Copyright Office to see whether someone has asserted copyright in their works; and anyway McFarlane's registrations no more revealed an intent to claim copyright in Gaiman's contributions, as distinct from McFarlane's own contributions as compiler and illustrator, than the copyright notices did. The significance of registration is that it is a prerequisite to a suit to enforce a copyright. More precisely, an application to register must be filed, and either granted or refused, before suit can be brought. 17 U.S.C. § 411(a). There is an interesting question, left open in our recent decision in *Chicago Bd. of Education v. Substance, Inc.*, 354 F.3d 624, 631 (7th Cir. 2003), and unnecessary to decide in this case either, whether if registration is granted by mistake the registrant may nonetheless sue. All that is important in this case is that it is no more the purpose of registration to start statutes of limitations running than it is the purpose of the copyright notice itself to do so.

We are therefore led to question the suggestion in *Saenger Organization, Inc. v. Nationwide Ins. Licensing Associates, Inc.*, *supra*, 119 F.3d at 66, that registration provides constructive notice of a claim of ownership. That would not, to repeat, matter in a case such as this in which the registered work is a compilation. But it probably wouldn't matter in any case.

(We further note that there was actual as well as constructive notice in *Saenger*.) For one thing, the court was wrong to say that registration gives constructive notice. What the Act actually says is that recording a document in the Copyright Office gives constructive notice of the facts in the document if the document identifies a registered work. 17 U.S.C. § 205(c). The purpose is to establish priority in the event of disputes, in bankruptcy court or elsewhere, over creditors' rights. *In re World Auxiliary Power Co.*, 303 F.3d 1120, 1125-27 (9th Cir. 2002); *Broadcast Music, Inc. v. Hirsch*, 104 F.3d 1163, 1165-67 (9th Cir. 1997); 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 10.07 (2003). A creditor who wants to know whether he can seize a debtor's copyright consults the register; a co-author does not.

There is also nothing in the demand letter that Gaiman's lawyer wrote McFarlane to indicate that Gaiman believed McFarlane was denying Gaiman's joint ownership of the copyrights on the three characters. The issue of copyright ownership is distinct from that of the copyright owner's entitlement to royalties when, as in this case, he is not the publisher of the copyrighted work. The fact that the author owns the copyright doesn't determine how he and the publisher will divide the income from the sale of copies of the work. That is a matter of contract. Sometimes author and publisher disagree over the meaning of their contract (and it is the contract that will specify the division of income) or whether the publisher is adhering to the contract in good faith. Disagreement was especially likely here, where the parties' contract not only was oral but failed to specify the division of income beyond what could be inferred from McFarlane's promise to treat Gaiman better than "the big guys" (in particular, it seems, DC Comics) treated Gaiman.

The existence of a dispute over the terms of a publication contract does not alert the author to a challenge to his copy-

right. Quite the contrary, it presumes that he owns the copyright. If his work is in the public domain, the publisher could publish it without the author's permission, so would hardly be likely to have promised to pay him for the "right" to publish it—he would already *have* (along with the rest of the world) the right to publish it. Sending the kind of demand letter that Gaiman's lawyer sent no more suggests doubt about the legal basis for the demand than sending a collection letter, of which the demand letter was a variant, suggests doubt that the writer is entitled to the debt that he is seeking to collect.

There was other evidence that right up until McFarlane's 1999 letter, receipt of which clearly did start the statute of limitations running, he acknowledged or at least didn't deny Gaiman's ownership of copyrights in the three characters. There was the reference in the royalty reports to Gaiman's being the "co-creater" of the characters, the fact that McFarlane let pass without comment Gaiman's claim in the demand letter to have created the characters, and the payment to Gaiman of royalties on the statuettes, payment that would make most sense if they were derivative works of copyrighted characters—with Gaiman the (joint) owner of the copyrights. McFarlane argues that he could have given Gaiman these royalties pursuant to contract, and he points out that under Gaiman's work for hire agreement with DC Comics Gaiman received payments denominated as "royalties" even though he had no copyrights. But McFarlane also contends that DC Comics would not have paid Gaiman royalties on the statuettes, so what would have been Gaiman's entitlement to such royalties from him unless Gaiman had a copyright interest?

We have referred to statements and actions by McFarlane that seem positively to acknowledge Gaiman's copyrights, and these sort of "lulling" comments might seem to suggest

an alternative basis for rejecting McFarlane's statute of limitations defense—the doctrine of equitable estoppel. *Hentosh v. Herman M. Finch University of Health Sciences/The Chicago Medical School*, 167 F.3d 1170, 1174 (7th Cir. 1999); *Singletary v. Continental Illinois National Bank & Trust Co.*, 9 F.3d 1236, 1241 (7th Cir. 1993); *Buttry v. General Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir. 1995). But that is a tolling doctrine, not an accrual doctrine, and tolling doctrines do not automatically give a person the full statutory period for suit. *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 452-53 (7th Cir. 1990). Suppose the claim accrued in Year 1 and the statute of limitations is three years, but because of lulling comments by the violator the victim doesn't learn of his claim until Year 10. He cannot just sit on this haunches until Year 13, because his claim did not accrue in Year 10; he must sue as soon as it is feasible to do so.

Or so, at least, some cases hold. *Shropshear v. Corporation Counsel*, 275 F.3d 593, 597-99 (7th Cir. 2001); *Hi-Lite Products Co. v. American Home Products Corp.*, 11 F.3d 1402, 1406-07 (7th Cir. 1993) (Illinois law); *Butler v. Mayer, Brown & Platt*, 704 N.E.2d 740, 745 (Ill. App. 1998). Others, distinguishing equitable estoppel, where the defendant is responsible for the plaintiff's delay, from equitable tolling, where he is not, hold that in the former case though not the latter the plaintiff can subtract the entire period of the delay induced by the defendant, or in other words can extend the statutory period by the full amount of the delay. *Doe v. Blue Cross & Blue Shield United of Wisconsin*, 112 F.3d 869, 876 (7th Cir. 1997); *Ott v. Midland-Ross Corp.*, 600 F.2d 24, 32-33 (6th Cir. 1979). At least one case takes a middle position: the plaintiff is *presumptively* entitled to subtract the entire period. *Buttry v. General Signal Corp.*, *supra*, 68 F.3d at 1494.

We needn't try to untangle this knot. For while Gaiman waited the full statutory period (minus a month) to sue,

without an excuse that would entitle him to invoke a tolling doctrine that requires due diligence, he doesn't *need* an excuse because the jury found that his claim did not accrue more than three years before he sued.

The case for rejecting the statute of limitations defense was not open and shut. Gaiman was an experienced author, and may have smelled a rat early on. The jury could have disbelieved his denial that he saw the "related characters" copyright notices in the paperback books. And the fact that he was content with compensation no greater than what he received from DC Comics for work made for hire allows an inference that the real deal between him and McFarlane was that McFarlane would own the copyrights but pay Gaiman as well as or better than DC Comics, which also owned the copyrights on Gaiman's work, did. If better, then maybe paying him royalties on the statuettes was McFarlane's method of treating Gaiman better than DC Comics did. But all this is just to say that it was a close case. We cannot say that the jury was unreasonable to find that not until February of 1999 was Gaiman placed on notice that McFarlane was denying that Gaiman had copyrights on the three characters, and thus to reject the statute of limitations defense.

But we must consider McFarlane's alternative ground for reversal—that Medieval Spawn and Cogliostro are not copyrightable. (Partial reversal, actually, because McFarlane concedes that Gaiman is a joint owner of Angela.) This ground may seem inconsistent with McFarlane's contention that the "all related characters" copyright notice established that he, not Gaiman, owned the copyrights on Medieval Spawn and Cogliostro. If they were not copyrightable, McFarlane had no copyright in them. In fact, it became apparent at argument that McFarlane thinks that he owns copyright on them but that Gaiman doesn't. His theory

seems to be that they became copyrightable, after *Spawn* No. 9 was published, as a result of further work done on them by him. We think they were copyrightable from the start, and that Gaiman owns the copyrights jointly with McFarlane. To explain this we must say more about the characters, black and white pictures of whom we append to this opinion. A detailed description of the characters may be found, along with color pictures, at http://spawn.home.sapo.pt/Characters.html.

McFarlane's original Spawn, Al Simmons, was a tall figure clad in what looks like spandex (it is actually "a neural parasite") beneath a huge blood-red cloak, making him a kind of malevolent Superman figure, although actually rather weak and stupid. His face is a shiny plastic oval with eyeholes but no other features. Gaiman decided to begin *Spawn* No. 9 with a different Spawn, whom he called "Olden Days Spawn." He explained to McFarlane that "[Olden Days] Spawn rides up on a huge horse. He's wearing a kind of Spawn suit and mask, although the actual costume under the cloak is reminiscent of a suit of armour." McFarlane drew "Olden Days Spawn" as (in the words of his brief) "essentially Spawn, only he dressed him as a knight from the Middle Ages with a shield bearing the Spawn logo." To make him credibly medieval, Gaiman in his script has Olden Days Spawn say to a damsel in apparent distress, "Good day, sweet maiden." The "damsel" is none other than Angela, a "maiden" only in the sense of making her maiden appearance in *Spawn* No. 9. Angela is in fact a "warrior angel and villain" who, scantily clad in a dominatrix outfit, quickly dispatches the unsuspecting Olden Days Spawn with her lance.

We learn that this event occurred in the thirteenth century, and the scene now shifts to the present day. Angela is dressed as a modern professional woman. The Al Simmons

Spawn is lurking about in an alley and it is here that we meet Count Cogliostro for the first time. McFarlane had wanted a character who would be "basically. . . the wisened [*sic*] sage that could sort of come down and give all the information and assimilate it." Gaiman interpreted this as an instruction to create "a character who can talk to Spawn and tell him a little bit more about what's going on in the background and can move the story along." So he created an "old man, who starts talking to Spawn and then telling him all these sort of things about Spawn's super powers that Spawn couldn't have known. And when you first meet him [Cogliostro] in the alley you think he's a drunken bum with the rest of them, and then we realize no, he's not. He's some kind of mysterious stranger who knows things."

Gaiman further described Cogliostro in a draft of *Spawn* No. 9 as "a really old bum, a skinny, balding old man, with a grubby greyish-yellow beard, like a skinny santa claus. He calls himself Count Nicholas Cagliostro" (later spelled Cogliostro). In a brief scene, Cogliostro, drawn by McFarlane as an old man with a long grey beard who faintly resembles Moses—McFarlane had been dissatisfied with Gaiman's verbal description, which made Cogliostro sound like a wino—explains to Simmons-Spawn some of the powers of Hellspawn of which Simmons is unaware. Cogliostro displays his mysterious wisdom by calling him "Simmons," to the latter's bafflement—how could Cogliostro have known? Angela then appears in her dominatrix costume, there is another duel, and she vanquishes Simmons (whose powers are in fact unimpressive), but does not kill him. He then blows himself up by accidentally pushing the wrong button on Angela's lance, which she had left behind. Happily he is not killed—merely (it seems) translated into another dimension—and will reappear in subsequent issues of *Spawn*.

McFarlane makes two arguments for why Gaiman does not have copyright in Medieval Spawn (the name that McFarlane settled on for Olden Days Spawn) or Cogliostro. The first is that all that Gaiman contributed was the idea for the characters, and ideas are not copyrightable, only expression is and the expression was due to McFarlane's drawing of the characters. It is true that people who contribute merely nonexpressive elements to a work are not copyright owners. As we said in *Seshadri v. Kasraian*, *supra*, 130 F.3d at 803, "the assistance that a research assistant or secretary or draftsman or helpfully commenting colleague provides in the preparation of a scholarly paper does not entitle the helper to claim the status of a joint author." There has to be *some* original expression contributed by anyone who claims to be a co-author, and the rule (we'll consider an exception momentarily) is that his contribution must be independently copyrightable. E.g., *Erickson v. Trinity Theatre, Inc.*, *supra*, 13 F.3d at 1071; *Aalmuhammed v. Lee*, *supra*, 202 F.3d at 1231; 1 William F. Patry, *Copyright Law and Practice* 362-65 (1994). Had someone merely remarked to McFarlane one day, "you need a medieval Spawn" or "you need an old guy to move the story forward," and McFarlane had carried it from there, and if later a copyeditor had made some helpful editorial changes, neither the suggester nor the editor would be a joint owner. Cf. *Erickson v. Trinity Theatre, Inc.*, *supra*, 13 F.3d at 1064, 1071-72. Otherwise almost every expressive work would be a jointly authored work, and copyright would explode.

But where two or more people set out to create a character jointly in such mixed media as comic books and motion pictures and succeed in creating a copyrightable character, it would be paradoxical if though the result of their joint labors had more than enough originality and creativity to be copyrightable, no one could claim copyright. That would be peeling the onion until it disappeared. The decisions that

say, rightly in the generality of cases, that each contributor to a joint work must make a contribution that if it stood alone would be copyrightable weren't thinking of the case in which it *couldn't* stand alone because of the nature of the particular creative process that had produced it.

Here is a typical case from academe. One professor has brilliant ideas but can't write; another is an excellent writer, but his ideas are commonplace. So they collaborate on an academic article, one contributing the ideas, which are not copyrightable, and the other the prose envelope, and unlike the situation in the superficially similar case of *Balkin v. Wilson*, 863 F. Supp. 523 (W.D. Mich. 1994), they sign as coauthors. Their intent to be the joint owners of the copyright in the article would be plain, and that should be enough to constitute them joint authors within the meaning of 17 U.S.C. § 201(a). This is the valid core of the Nimmers' heretical suggestion that "if authors *A* and *B* work in collaboration, but *A*'s contribution is limited to plot ideas that standing alone would not be copyrightable, and *B* weaves the ideas into a completed literary expression, it would seem that *A* and *B* are joint authors of the resulting work." 1 Nimmer & Nimmer, *supra*, § 6.07, p. 6-23; see also 1 Patry, *supra*, at 365-66.

The contents of a comic book are typically the joint work of four artists—the writer, the penciler who creates the art work (McFarlane), the inker (also McFarlane, in the case of *Spawn* No. 9, but it would often be a different person from the penciler) who makes a black and white plate of the art work, and the colorist who colors it. The finished product is copyrightable, yet one can imagine cases in which none of the separate contributions of the four collaborating artists would be. The writer might have contributed merely a stock character (not copyrightable, as we're about to see) that achieved the distinctiveness required for copyrightability

only by the combined contributions of the penciler, the inker, and the colorist, with each contributing too little to have by his contribution alone carried the stock character over the line into copyright land.

McFarlane's second argument against the copyrightability of Medieval Spawn and Cogliostro appeals to the confusingly named doctrine of "scènes à faire" (literally "scenes for action," a theatrical term meaning the climactic scene in a play or opera, which is not the legal meaning). Related to the fundamental idea-expression dichotomy that we've already mentioned, the doctrine teaches that "a copyright owner can't prove infringement by pointing to features of his work that are found in the defendant's work as well but that are so rudimentary, commonplace, standard, or unavoidable that they do not serve to distinguish one work within a class of works from another." *Bucklew v. Hawkins, Ash, Baptie & Co.*, 329 F.3d 923, 929 (7th Cir. 2003); see also *Reed-Union Corp. v. Turtle Wax, Inc.*, 77 F.3d 909, 913-14 (7th Cir. 1996); *Atari, Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607, 616-17 (7th Cir. 1982); *Williams v. Crichton*, 84 F.3d 581, 587-89 (2d Cir. 1996). If standard features could be used to prove infringement, not only would there be great confusion because it would be hard to know whether the alleged infringer had copied the feature from a copyrighted work or from the public domain, but the net of liability would be cast too wide; authors would find it impossible to write without obtaining a myriad of copyright permissions.

A stock character is a stock example of the operation of the doctrine, e.g., *Cavalier v. Random House, Inc.*, 297 F.3d 815, 824-25 (9th Cir. 2002); *Williams v. Crichton, supra*, 84 F.3d at 588-89, and a drunken old bum is a stock character. *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986). If a drunken old bum were a copyrightable character,

so would be a drunken suburban housewife, a gesticulating Frenchman, a fire-breathing dragon, a talking cat, a Prussian officer who wears a monocle and clicks his heels, a masked magician, *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1175-76 (9th Cir. 2003), and, in Learned Hand's memorable paraphrase of *Twelfth Night*, "a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress." *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930). It would be difficult to write successful works of fiction without negotiating for dozens or hundreds of copyright licenses, even though such stereotyped characters are the products not of the creative imagination but of simple observation of the human comedy.

McFarlane argues that even as dolled up by the penciler, the inker, and the colorist, Cogliostro is too commonplace to be copyrightable. Gaiman could not copyright a character described merely as an unexpectedly knowledgeable old wino, that is true; but that is not his claim. He claims to be the joint owner of the copyright on a character that has a specific name and a specific appearance. Cogliostro's age, obviously phony title ("Count"), what he knows and says, his name, and his faintly Mosaic facial features combine to create a distinctive character. No more is required for a character copyright. *DC Comics Inc. v. Reel Fantasy, Inc.*, 696 F.2d 24, 25, 28 (2d Cir. 1982) (Batman, though assumed rather than actually determined to be copyrightable); *Walt Disney Productions v. Air Pirates*, 581 F.2d 751, 753-55 (9th Cir. 1978) (Mickey Mouse *et al.*); *Detective Comics v. Bruns Publications*, 111 F.2d 432, 433-34 (2d Cir. 1940) (Superman); *Fleischer Studios, Inc. v. Ralph A. Freundlich, Inc.*, *supra*, 73 F.2d at 278 (Betty Boop). As long as the character is distinctive, other authors can use the stock character out of which it may have been built without fear (well, without too much fear) of being accused as infringers.

We are mindful that the Ninth Circuit denied copyrightability to Dashiell Hammett's famously distinctive detective character Sam Spade in *Warner Bros. Pictures, Inc. v. Columbia Broadcasting System, Inc.*, 216 F.2d 945 (9th Cir. 1954). That decision is wrong, though perhaps understandable on the "legal realist" ground that Hammett was not claiming copyright in Sam Spade—on the contrary, he wanted to reuse his own character but to be able to do so he had to overcome Warner Brothers' claim to own the copyright. The Ninth Circuit has killed the decision, see *Olson v. National Broadcasting Co.*, 855 F.2d 1446, 1452 and n. 7 (9th Cir. 1988); *Walt Disney Productions v. Air Pirates*, *supra*, 581 F.2d at 755 and n. 11, though without the usual obsequies, but even if the decision were correct and were binding authority in this circuit, it would not rule this case. The reason is the difference between literary and graphic expression. The description of a character in prose leaves much to the imagination, even when the description is detailed—as in Dashiel Hammett's description of Sam Spade's physical appearance in the first paragraph of *The Maltese Falcon*: "Samuel Spade's jaw was long and bony, his chin a jutting v under the more flexible v of his mouth. His nostrils curved back to make another, smaller, v. His yellow-grey eyes were horizontal. The v *motif* was picked up again by thickish brows rising outward from twin creases above a hooked nose, and his pale brown hair grew down—from high flat temples—in a point on his forehead. He looked rather pleasantly like a blond satan." Even after all this, one hardly knows what Sam Spade looked like. But everyone knows what Humphrey Bogart looked like. A reader of unillustrated fiction completes the work in his mind; the reader of a comic book or the viewer of a movie is passive. That is why kids lose a lot when they don't read fiction, even when the movies and television that they watch are aesthetically superior.

Although Gaiman's verbal description of Cogliostro may well have been of a stock character, once he was drawn and named and given speech he became sufficiently distinctive to be copyrightable. Gaiman's contribution may not have been copyrightable by itself, but his contribution had expressive content without which Cogliostro wouldn't have been a character at all, but merely a drawing. The expressive work that is the comic-book character Count Nicholas Cogliostro was the joint work of Gaiman and McFarlane—their contributions strike us as quite equal—and both are entitled to ownership of the copyright.

Medieval Spawn may seem to present a closer case than Cogliostro so far as copyrightability is concerned, because he has no name in *Spawn* No. 9. In fact he has never been named—"Medieval Spawn" is a description, not a proper name. But the Lone Ranger doesn't have a proper name either (at least not one known to most of his audience—actually he does have a proper name, John Reid), so that can't be critical. A more telling objection to copyrightability is that the identifier, "Medieval Spawn," was added by McFarlane in subsequent issues of *Spawn* to which Gaiman did not contribute. Only his costume and manner of speech, together with the medieval background, distinguish him in *Spawn* No. 9 from other Hellspawn.

But that is enough expressive content for copyrightability, because Spawn itself (the original Spawn, né Al Simmons) is not a stock character (McFarlane would have a heart attack if we said he was). Spawn is copyrightable, and the question is simply whether Medieval Spawn is sufficiently distinct from Spawn also to be copyrightable as a derivative work. 17 U.S.C. §§ 101, 103; *Lee v. A.R.T. Co.*, 125 F.3d 580, 581-82 (7th Cir. 1997); *Gracen v. Bradford Exchange*, 698 F.2d 300, 305 (7th Cir. 1983); *Entertainment Research Group, Inc. v.*

*Genesis Creative Group, Inc.*, 122 F.3d 1211, 1219-20 (9th Cir. 1997); *Woods v. Bourne Co.*, 60 F.3d 978, 990 (2d Cir. 1995).

The purpose of requiring that a derivative work to be copyrightable be significantly different from the copyrighted original is twofold: to avoid the confusion that would be created if two indistinguishable works were copyrighted, *Pickett v. Prince*, 207 F.3d 402, 405 (7th Cir. 2000); *Gracen v. Bradford Exchange, supra*, 698 F.2d at 304; *Entertainment Research Group, Inc. v. Genesis Creative Group, Inc., supra*, 122 F.3d at 1220, and to prevent a copyright owner from extending his copyright beyond the statutory period by making an identical work as the statutory period was nearing its end, calling it a derivative work, and copyrighting it. *Lee v. A.R.T. Co., supra*, 125 F.3d at 581-83. These are really one point rather than two, since the second ploy would work only because a copier would find it difficult to prove that he had copied the expired original rather than the unexpired derivative work. Just suppose that the copyright on Work *A* expires in 2000 and the copyright on *B* in 2020, and in 2001 someone produces a work indistinguishable from either and claims that he is copying *A*, not *B*, and so is not an infringer, and the owner of the unexpired copyright on *B* replies no, it's *B* you're copying.

That is no problem here. A Spawn who talks medieval and has a knight's costume would infringe Medieval Spawn, and if he doesn't talk medieval and doesn't look like a knight then he would infringe Spawn.

To summarize, we find no error in the district court's decision, and since the decision gave Gaiman all the relief he sought, there is no need to consider the cross-appeal.

AFFIRMED.

APPENDIX:

SPAWN, MEDIEVAL SPAWN, ANGELA, AND COUNT
NICHOLAS COGLIOSTRO

S<small>PAWN</small>

MEDIEVAL SPAWN

ANGELA

COGLIOSTRO

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*