L. M. Montgomery MacDonald *vs.* The Page Company
& another.

Suffolk.     November 17, 1924. — February 24, 1925.

Present: Rugg, C.J., Braley, Pierce, Carroll, & Wait, JJ.

*Contract*, Construction,·Performance and breach.

An authoress and one who had published her works, in 1919, in settlement
of certain disagreements between them, made a contract in writing
which, among other provisions, contained an assignment by the author-
ess to the publisher of such rights as she had in certain short stories
published in newspapers some years before, and provided that the
publisher might publish another book made up of such short stories;
and the authoress agreed that, if she found she had the "stories afore-
said," she would "send those manuscripts which contain her revisions
of said stories, otherwise copies revised or not revised, as she may see
fit," and that the publisher might make slight improving changes or
amendments to the stories.    In 1919, the authoress sent revised manu-
script of the stories to the publisher.    Thereafter the publisher pub-
lished a book of stories, not from the manuscript she sent in 1919,
but from copies of manuscript submitted to him in 1912 as a revision
of the stories formerly published in the newspapers, which he had re-
tained when he returned the original of such revised manuscript to
the authoress.    A suit to enjoin further publication or sale of the book
was heard by a master and afterwards by a judge upon the master's
report.    The judge ordered a decree granting the injunction sought
and the defendant alleged exceptions.    Upon a review of evidence set
out in the bill of exceptions and the findings by the master, this court
*held*, that
      (1) It was not the intention of the parties that the plaintiff should
assign to the defendant a right to the 1912 revision of her stories;
      (2) An exception to rulings by the judge ordering the decree must be
overruled;
      (3) No error of law appeared in a ruling by the judge in effect that
the form of the stories sent by the plaintiff to the defendant in 1919 was
a compliance with the obligation resting on her under the contract.

Bill in equity, filed in the Superior Court on April
24, 1920, and afterwards amended, seeking to enjoin the
defendant from publishing a book, "Further Chronicles of
Avonlea," from manuscript of the plaintiff which, the plain-
tiff alleged, the defendant was not authorized to use; and

for an accounting of profits realized by the defendant from the unauthorized publication and sale, and for damages.

In the Superior Court, the suit was referred to a master. The rule to the master contained a note at the bottom as follows: "The master shall report the evidence if either party so requests." The master filed a report. The first paragraph of the report read as follows: "Pursuant to the reference in the above named cause, I have met the parties, heard their evidence and examined their exhibits, all of both of which is annexed hereto as part hereof, and have considered their arguments and now make the following report." The exceptions filed by the defendant, after the ordering of a decree for the plaintiff, stated that the evidence "was taken by a commissioner and covered about fifteen hundred type-written pages." A statement of findings and rulings filed by the judge contained numerous references to pages of evidence running from page 108 to page 1315.

The suit was heard upon the master's report and exceptions thereto by *Hammond*, J., who filed a statement of his findings and rulings and decision, which included the following:

"Upon the facts as found by the master I am unable to find that the plaintiff is entitled to damages as distinct and separate from profits. A decree may be entered overruling the exceptions to the master's report and granting an injunction in appropriate terms restraining the defendant company from publishing or selling the thirteen stories mentioned in the contract in the form in which they appear in the 'Further Chronicles of Avonlea' or in any other form inconsistent with the contract as interpreted in this memorandum, and re-committing the case to the master to take an account of profits."

Other material evidence, findings by the master and findings and rulings by the judge are described in the opinion. The defendants alleged exceptions. In their bill of exceptions were included, besides the pleadings and the statement by the judge of his findings and rulings, certain extracts only from the evidence which was before the master.

*Asa P. French*, for the defendants.

*W. A. Rollins*, for the plaintiff.

RUGG, C.J.   This is a suit in equity.   Its object is to restrain the defendant from publishing a volume of short stories written by the plaintiff and for damages and an accounting of profits.   The case was referred to a master. His report contains findings at length of all material facts, with parts of the evidence.   The judge of the Superior Court, who heard the case on exceptions to the master's report, apparently had before him a full transcript of the evidence.   The case is before us on the bill, answer, master's report, certain extracts from or condensations of evidence, the decision of the judge and the exceptions to rulings made by him.   All the evidence material to the exceptions is in the record.   The Page Company is the only excepting party and will be called in this opinion the defendant.

The plaintiff is an author and the defendant a publisher. Several books written by the plaintiff and published by the defendant achieved considerable popularity and a large number of copies were sold.   The plaintiff has established a reputation as a writer of popular fiction, which is of pecuniary value to her.   She is entitled to protect and preserve it.   She wrote and the defendant published Anne of Green Gables and Anne of Avonlea before 1912.   The chief character of those books was Anne Shirley, and she became widely known among readers of fiction.   It was thought by both parties hereto that the presence of that character in any new book of the plaintiff would stimulate public interest and probably add to its financial returns.   In 1912, after some correspondence, the plaintiff sent to the defendant the manuscripts of twenty-eight short stories.   These all were copied in typewriting by the defendant and subsequently twelve were published in a book entitled Chronicles of Avonlea. In several of these stories more or less conspicuous references were made to Anne Shirley.   Shortly afterwards, but in 1912, the defendant at the plaintiff's request returned to her the manuscripts of the stories not included in that book. At some time thereafter the plaintiff changed to another publisher.   The relations between the parties, which hitherto had been cordial, became strained.   In 1919 litigation ensued arising from their connection as author and publisher.

After negotiations culminating in conferences extending over a number of days, a written contract was made designed to end their business association through the purchase by the defendant from the plaintiff of her royalty rights in all her books published by the defendant, to settle all their disputes and to terminate the litigation.

A part of that contract provided for the publication by the defendant at its option of a new volume of short stories written by the plaintiff. The present controversy centers about the publication by the defendant in 1920 of that new volume of short stories under the title, Further Chronicles of Avonlea. In that publication the defendant used certain copies made by it in 1912 of the short stories then sent it by the plaintiff but not used in Chronicles of Avonlea, the volume published in that year. The manuscripts of 1912 were revisions of short stories earlier published by the plaintiff in newspapers and magazines.

With respect to the portions of the contract of 1919, relating to the short stories to be published by the defendant, the parties approached its framing and execution in these circumstances: "The plaintiff was sufficiently informed and knew in 1912, that the defendant then made typewritten copies of her stories. . . . And I find [says the master] that in January, 1919, she had forgotten that the defendant had made typewritten copies of the stories submitted in 1912, and had returned to her the original printed clippings. There was then no fraudulent concealment by the defendant that it had all, or at least nearly all, of these copies in its possession, though the plaintiff did not understand that it had them." "In the years that had then elapsed since 1912, the typewritten copies in the defendant's possession had not been a subject for its attention; but it knew that it had them, or should have them, and during the negotiation of the contract located all but one or two of them." During these negotiations the attorney for the defendant wrote to the attorney for the plaintiff a letter in which he referred (as one of the matters to be included in the settlement but not theretofore mentioned) to the "manuscripts" of short stories submitted by the plaintiff to the defendant in 1912

in connection with the publication of the Chronicles of Avonlea. He alluded to these stories as having been published at divers times in various papers and magazines, as not being copyrighted, and hence as being free for publication and sale by anybody without obligation as to royalties. Then occurs this statement: "The Page Company has typewritten copies or originals in its possession and may at some future time wish to publish those which they regarded as the poorer ones and which were not included in the ' Chronicles.' " Then follow further general suggestions and argument touching these short stories, their value or want of value, and their possible publication. This letter was read by the plaintiff before the contract of 1919 was signed, as appears from her testimony. She testified further in substance that from that letter she "gathered" the conclusion that the defendant had made copies of the manuscripts which she had sent it in 1912.

The negotiations for settlement, says the master, "continued through a week, the parties personally participating under the guidance and advice of able counsel and, after repeated amendments under scrutiny of counsel for the parties, both learned in the law of contracts, the agreement reached was embodied in the contract" of 1919. That contract recited, as summarized by the master, "the previous publication contracts between the parties, and that the plaintiff has theretofore submitted to the defendant sixteen stories which have been published in sundry newspapers and magazines in Canada and the United States of America, (stating their titles . . .) and that the parties have no exact knowledge . . . whether said stories are or are not under legal copyright of the United States of America or the Dominion of Canada, or elsewhere, and that The Page Company is desirous to publish as thereinafter provided, and as its own sole property, a book of short stories made up of all or part of the said stories, as The Page Company may determine, except 'The Promise of Lucy Ellen' and 'A Chip of the Old Block.' " It then proceeds: "NOW THEREFORE in consideration of the foregoing the parties hereto agree as follows:—'The party of the first part assigns

to the party of the second part such rights as she may have. in the said stories, (except 'The Promise of Lucy Ellen' and 'A Chip of the Old Block') subject to such rights, if any, as may be held by any magazines or publications in which said stories or any of them have appeared and the rights of any person or persons who may have taken out copyright thereon, but party of the first part makes no guarantee in this connection. Party of the first part, however, agrees that in as far as she may do so without covenanting regarding her title or present rights in the matter of said stories and each of them, that the party of the second part may make such publication and publish as its own sole property a book made up of said stories or part of the same, as by her, except that as two of the said stories (1) 'The Promise of Lucy Ellen' and (2) 'A Chip of the Old Block' have already been used in other form, and the incidents of a third story, to wit, 'The Deferment of Janet' have appeared in her book published by the party of the second part, called 'Anne of the Island ' . . . If the party of the first part shall find on her return to Canada that she has the fourteen of the sixteen stories aforesaid, after excluding 'The Promise of Lucy Ellen' and 'A Chip of the Old Block,' she shall send those manuscripts which contain her revisions of said stories, otherwise copies revised or not revised, as she may see fit. The party of the first part makes no guarantee of the literary merit of any of the said productions. The party of the first part further agrees that in preparing for the publication of said new book the party of the second part shall be entitled to make slight changes or amendments to the stories, if in its opinion the same will tend to improve the book, but no changes shall be made bringing 'Anne Shirley' into any story where she does not appear either in the story as originally published or as revised by the party of the first part. In the title of the said proposed book the words 'Anne' and 'Anne Shirley' shall not be used either by way of title or sub-title. No picture of 'Anne Shirley' or picture entitled 'Anne' or 'Anne Shirley' shall appear in or on said proposed book. The party of the second part shall not advertise the said proposed book as an 'Anne' Book. But

nothing in this agreement contained shall prevent the party of the second part from advertising that the book is by the author of the 'Anne.' books and any of them." The contract also recites the payment by the defendant to the plaintiff of the sum of $17,880. The right to publish these short stories was a part of what the defendant received for that payment.

The plaintiff, on returning to Canada after the execution of the contract, made search and found that with one exception she did not have any of the manuscripts containing her 1912 revisions returned to her by the defendant in that year. She had destroyed them. At the execution of the contract she did not expect to find them and said as much to the defendant. She therefore revised the original stories as they appeared in newspaper or magazine, had them copied in typewriting and sent them to the defendant. These revisions made in 1919 consisted almost entirely in the deletion of certain passages, some because used by her in other books published by her after 1912, and others because regarded by her as objectionable on literary grounds. Little, if anything, was added to them.

Thus it appears that there were three forms of most of the stories in Further Chronicles of Avonlea: (1) the original form in which they were written and printed in newspaper and magazine, (2) the revision made by the author in 1912 in preparation for the publication of Chronicles of Avonlea, of which at the time of the 1919 contract the defendant had the only copies, and (3) the revision made by the author in 1919 pursuant to the contract of that year.

One element of market value in the stories of 1912 was the reference contained in several of them to Anne Shirley, the character already mentioned, who had attracted much favorable public attention in Anne of Green Gables, the most successful of the books of the plaintiff published by the defendant. The presence of that element was much urged by the defendant in correspondence with the plaintiff prior to bringing out the book of short stories in 1912. Some of the unpublished stories then submitted contained references to Anne Shirley. These references constituted one of

the chief motives impelling the defendant, in publishing Further Chronicles of Avonlea, to use the 1912 copies instead of those sent by the plaintiff in 1919. The original newspaper and magazine stories and the revision of 1919 contained no references to Anne, as the defendant knew.

The sixteen stories in the manuscript form as revised by the plaintiff in 1912 and then submitted to the defendant but not used by it in Chronicles of Avonlea, had never been published before the 1919 contract. As stated by the judge in his decision; — "They represented a very considerable amount of labor, were admittedly superior in point of literary excellence to the original newspaper stories which were the plaintiff's early work and were 'immature and crude in comparison.' They contained much new material which the defendant considered could be copyrighted when the original stories could not be." The defendant in using the 1912 revision had these factors in mind.

The parties drafted their contract under skilled professional advice in the light of all this expert knowledge of intelligent persons respecting a matter of financial and literary importance to each of them. These conditions warrant the implication that words, clauses and sentences were used with appreciation of their exact meaning and their precise application to the subject matter.

It is significant that the 1912 revision of the stories is not made the subject of definite transfer in the contract. The additions and changes thereby made as compared with the forms of these stories previously printed in the newspapers and magazines constituted a definite property right in the plaintiff. The defendant had no property right in them. Its possession of the typewritten copies conferred no license or privilege to publish them. It held them wholly subject to the exclusive title of the plaintiff to the parts of the stories never before printed, even if not copyrighted. *Baker* v. *Libbie*, 210 Mass. 599. Such omission seems strange, if persons, familiar as these parties were with property in literary productions, had intended the one to transfer and the other to acquire title to the 1912 revision of the stories.

Closer analysis of the contract fails to disclose a purpose to

transfer title to, or to allow the defendant to publish, the 1912 revision. The first recital of the contract bearing on this matter is to the effect that the plaintiff has "written and heretofore submitted" to the defendant "sixteen short stories which have been published in sundry newspapers and magazines." A list follows of the titles of the stories and the names and dates of the newspapers and magazines in which they have been printed. This, standing alone without its context, is at best equivocal. Reference may be made to the form "submitted" or to the form "published." The minuteness of description of the original publication of each story would have been unnecessary verbiage if it were intended to transfer title to the revisions submitted to the defendant, all of which were known by it to be in its possession by exact copies of those revisions. The next two references are to "said stories" in connection with copyright and to the desire of the defendant to publish a book "made up of all or part of the said stories." These stand on the same footing as the first reference. Then comes the clause of transfer of title, whereby the plaintiff "assigns" to the defendant "such rights as she may have in the said stories." This clause must be read in conjunction, not only with what precedes, but with the paragraph immediately following. That paragraph obligates the plaintiff on her return to Canada to search for "fourteen of the sixteen stories aforesaid" and if found to send "those manuscripts which contain her revisions of said stories, otherwise copies revised or not revised, as she may see fit." Here is direct reference to the 1912 revision of the stories. A vain obligation and a futile labor were thus imposed on the plaintiff if the parties were contracting with reference to a revision of stories at that moment in the possession of the defendant. The implication of this part of the contract is that the source from which the defendant was to get its material for publication was that which was to be sent it by the plaintiff after her return to Canada — the original manuscripts if she could find them; otherwise copies revised or not revised, at her choice. The contract in this particular required the plaintiff to send the manuscripts of her 1912 revision of her stories, if she could

find them; otherwise, copies of the stories revised or unrevised.  If she did not find the 1912 revised manuscripts, the only source from which copies could be obtained, on which to exercise the option reserved to her by the contract of revising or not revising before sending them to the defendant, was the original publication in newspapers and magazines.  That was a quite different agreement from one giving · unconditional permission to the defendant to publish copies of the 1912 revision in the possession of the defendant.  The contract prohibits the defendant strictly, in making permissible slight changes in or amendments to the stories, from bringing Anne Shirley into any story where she did not appear in the story as originally published or as revised by the plaintiff.  That character did not appear in any of the original publications of these stories, nor in any of the 1919 revisions, but did appear in some of the 1912 revisions.  This limitation would be bootless if the defendant could use a copy of the 1912 revision coming from its own vault rather than such originals or copies as the plaintiff might be able to find and send to the defendant.

The frame of the contract as a whole, its carefully phrased language, its references to certain manuscripts and its omission to refer specifically to the 1912 revision of manuscripts, in the light of the knowledge of the parties and the circumstances in which they approached the execution of the contract, forbid the interpretation that the 1912 revision of manuscript stories was transferred to the defendant, or that it thereby acquired the right to publish them.

There was no error of law in ruling in effect that the form of the stories sent by the plaintiff to the defendant in 1919 was a compliance with the obligation resting on her under the contract.

There is no occasion to disturb the ruling that the plaintiff has not established a right to damages.

The contract in its entirety in the light of the attendant facts restricted the defendant to the publication of the stories in the form sent to it by the plaintiff in 1919.  It is not ambiguous.  The rights of the plaintiff under it must be enforced according to its terms.

The plaintiff seasonably asserted her rights under the contract and gave notice of her intention to hold the defendant responsible for what she regarded its breach of the contract.

It rightly has not been contended that the order for injunction and for taking account of profits was erroneous, if the defendant had no right under the contract to publish the 1912 revision of the stories.

*Exceptions overruled.*