LYNCH, Circuit Judge.
The district court entered summary judgment for defendants due to plaintiffs failure to meet the Copyright Act’s three-year statute of limitations in this dispute over profits from the sale of Hummel figurines and images. Cambridge Literary Properties, Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. Kg. (Cambridge II), 448 F.Supp.2d 244 (D.Mass.2006). We affirm.
The key facts are set forth here and in our earlier opinion on a different issue in this case. Cambridge Literary Properties, Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. Kg. (Cambridge I), 295 F.3d 59, 61-62 (1st Cir.2002). Plaintiff Cambridge Literary Properties, Ltd. seeks a share of the profits reaped by defendants W. Goebel Porzellanfabrik G.m.b.H. & Co. Kg. and Goebel Art G.m.b.H. (collectively, “Goe-bel”) for the use of images taken from a German book published in 1934, Das Hummelr-Buch, in which Cambridge asserts a copyright interest. Specifically, Cambridge, which acquired its purported “rights” from two sets of heirs of a putative joint author of the book, seeks an accounting and imposition of trust on past and future profits Goebel realizes from the distribution of figurines derived from the book, Goebel’s use of the particular figure of “The Merry Wanderer” as its trademark or logo, the membership fees in the M.I. Hummel Club in the United States, and the like. Whether Cambridge in fact is a co-owner, through co-authorship, of any of its asserted rights is hotly contested by Goebel in its summary judgment papers and its brief on appeal. Indeed, Cambridge’s complaint asserts facts acknowledging Goebel’s claims of sole ownership.
The federal courts clearly have jurisdiction over this case. Cambridge chose to file the action in federal district court, and jurisdiction has never been at issue. We affirm the district court’s grant of summary judgment, affirming the recommendation of the magistrate judge. Plaintiffs ownership of any interest, as we have said, is hotly disputed, and is an issue governed by the Copyright Act. There is no agreement or stipulation of ownership. Yet Cambridge did not seek an adjudication of its ownership rights before seeking whatever remedy it may have if it has any ownership rights. Thus, this case is not a dispute between admitted co-owners. Rather, the complaint attempts to evade the issue of whether Cambridge has any ownership rights by simply asserting that Cambridge is a co-owner and then alleging that Cambridge, as a co-owner, is entitled under state law to an accounting and equitable trust. As a result, Cambridge argues, the federal statute of limitations that applies to establishing copyright ownership under the Copyright Act does not apply; rather, the state statute of limitations for an accounting applies.
The accounting and equitable trust claims created by state law are premature. Such claims may well be gov *81 erned by state law, but they are not ripe and necessarily rest upon plaintiff having met the antecedent showing that it has ownership rights under the Copyright Act. Plaintiff may not assert the state-law claims for accounting or equitable trust without establishing that it is a co-owner. Whether Cambridge is a co-owner in turn depends, on the facts of this case,[1] upon the federal Copyright Act. This in turn requires that Cambridge have asserted its ownership claims within that statute’s limitations period. The congressional intent that the Act’s limitations period applies to claims of ownership under the Act may not be undercut by Cambridge’s subterfuge.[2]
Under the Act, the cause of action accrues when a plaintiff “knows or has reason to know of the act which is the basis of the claim.” Santa-Rosa v. Combo Records, 471 F.3d 224, 227 (1st Cir.2006), cert. denied, — U.S. -, 127 S.Ct. 2265, 167 L.Ed.2d 1094 (2007) (internal quotation omitted). We reject plaintiffs novel approach to accrual. Cambridge may not escape the limitations bar if the statute barred the claims of the heirs from which it acquired the “rights.” Young v. Lepone, 305 F.3d 1, 17 (1st Cir.2002). Cambridge is also barred if it failed to timely act within the limitations period after it acquired the rights. Here, Cambridge and the heirs, on the undisputed facts, were put on sufficient notice to result in accrual more than three years before plaintiff instituted suit. Further, there is no basis for equitable tolling of the three-year limitations period.
I.
In describing the facts of the dispute, we make all reasonable inferences in favor of Cambridge, the party opposing summary judgment. T-Peg, Inc. v. Vermont Timber Works, Inc., 459 F.3d 97, 102 (1st Cir.2006).
Berta Hummel, as a young woman in Germany in the early 20th century, had a talent for drawing images of children in folk dress. In 1931, Hummel took her vows as a member of the Congregation of Franciscan Sisters at the Convent of Sies-sen (“Convent”) and became Sister Maria Innocentia Hummel. Sister Hummel and the Convent published some of Sister Hummel’s drawings as postcards and devotional pictures.
In 1934, a German publishing company, Emil Fink Verlag (“Fink”), approached Sister Hummel and the Convent about publishing some of Sister Hummel’s artworks in a book. In May of that year, Sister Hummel, the Superior of the Con *82 vent, and Fink entered into an agreement authorizing Fink to reproduce forty of Sister Hummel’s works in Das Hummelr-Buch The contract specified that the book would include, in addition to the drawings, poems and other text. About six months later, Fink contracted with Margarete Seemann, a Viennese poet, for the production of an introduction and fifty poems for use in the book.
Fink first published Das Hummel-Buck in Germany in December 1934. Fink applied to the United States Copyright Office for a copyright in the book in June 1936. Fink’s application lists Emil Fink Verlag as the “copyright owner,” and Hummel and Seemann as “author[s] or translators].”
Back in Germany, Fink was not the only firm seeking to commercialize Sister Hum-mel’s drawings. Franz Goebel, then the head of Goebel, also entered into a contract with Sister Hummel and the Convent in January 1935. In that contract, Sister Hummel and the Convent assigned to Goe-bel the exclusive right to manufacture and market porcelain figurines based on Sister Hummel’s drawings. Goebel continues to produce its line of “M. I. Hummel figurines” to this day. Goebel Art, a wholly owned subsidiary of Goebel, acts as the exclusive distributor and licensing agent for Goebel’s United States copyright interests derived from the 1935 contract. In addition to the sale of figurines, Goebel also profits from the Hummel copyrights through Goebel Art’s “M. I. Hummel Club,” which generates substantial income from membership fees.
In June 1962, Fink applied for a renewal copyright in “Das Hummel-Buch, by Bei'-ta Hummel ... [preface and verses by] Margarete Seemann.” The publishing house listed itself as “proprietor of copyright in a work made for hire.” In 1971, Goebel purchased all of Fink’s copyrights in Hummel-related works, including the American copyright in Das Hummel-Buck. That sale was also memorialized in documents filed with the Copyright Office.
Goebel was not always the sole American distributor of Hummel figurines. Until the mid-1990s, Goebel contracted with Schmid Brothers, Inc. (“Schmid”) to distribute the figurines in the United States. Schmid and Goebel quarreled repeatedly over their business arrangement in the courts of Germany and the United States. Sometime in the late 1960s, an attorney named Henry Herrmann began working for Schmid on matters related to disputes with Goebel. By 1971, Herrmann had obtained for Schmid an assignment of copyrights from Sister Hummel’s family; Sister Hummel had died in 1946. Herrmann also represented Schmid in a number of lawsuits pertaining to the Hummel rights. Herrman is the driving force behind Cambridge in the present dispute.
In 1992, during a lawsuit filed in the Eastern District of New York, Schmid and Goebel entered into a consent judgment that stated that the two parties owned “respective undivided one-half interests in the United States renewal copyright in [Das Hummel-Buck].” Herrmann executed the agreement on behalf of Schmid.
Schmid, which held interests in Das Hummelr-Buch, filed for bankruptcy in 1993. Herrmann, as a creditor in the bankruptcy proceedings, filed a claim for over $10,000,000 based on a contingency fee agreement with his former client. Herrmann settled his claim for $3,750,000. Goebel, for its part, acquired Schmid’s rights to the book in the wake of Schmid’s bankruptcy. With that acquisition, Goe-bel’s ownership interest in the United States copyright to Das Hummelr-Buch appeared to be perfected.
*83 At some point during the Goebel-Schmid litigation, Herrmann came to think that Margarete Seemann’s heirs might retain an interest in the United States copyright for Das Hummel-Buch because Seemann’s poems appear in the book. In order to exploit that interest, Herrmann sought an assignment of copyright interests from Seemann’s heirs. Herrmann formed Cambridge in August 1995 to effectuate that purpose. Herrmann continues to be the sole shareholder in Cambridge in addition to representing the company in this litigation.
Also in 1995, Herrmann identified Seem-ann’s heirs and assignees of Seemann’s alleged United States copyright interests in Das Hummel-Buch. They were Maria Romanowicz, a resident of Vienna, and Dr. Alexandrine Cermanovic-Kuzmanovic, a resident of Belgrade. Herrmann approached both heirs in August and September of 1995 with offers to purchase such United States copyright interests as they held in the book.
On September 6, 1995, Maria Romanow-icz signed a contract assigning to Cambridge all of her “right, title and interest in and to any and all United States Copyright Renewals in any of the works authored and/or co-authored by [Seemann], including, without limitation, the work ‘Das Hummel-Buch.’ ” The contract also specified that “included in this assignment are any and all of my legal and/or equitable monetary claims and causes of action I may have under American laws as of the date hereof for payments ... and/or ac-countings against third parties” for their exploitation of the United States copyright to Das Hummel-Buch. As to the other heir, although Herrmann first approached Cermanovic-Kuzmanovic in 1995, he did not obtain an assignment from her to Cambridge until February 1999. The terms of the second assignment were identical to the first.
Having thus assembled what it represented to be a fifty-percent interest (based on any interest held by the poet Seemann) in the United States copyright to Das Hummel-Buch, Cambridge filed the current action in the District of Massachusetts in February 2000, basing jurisdiction on diversity and, conditionally, on federal question jurisdiction.[3] Cambridge’s complaint pleaded two “claims”: one for “an accounting from [Goebel] of their profits from their use and benefit of said book and the two and three dimensional works derived therefrom”; and a separate claim for unjust enrichment seeking as a remedy “restitution and [ ] a decree imposing a constructive trust ... on [Goebel’s] intellectual property relating to the works derived from the [b]ook.” The complaint states, in conclusory fashion, that Cambridge is entitled to these remedies due to its status as “joint legal and/or beneficial owner[] of the United States Renewal Copyright” in Das Hummel-Buch,[4]
*84 Cambridge does not claim it owns any independent copyright interests in any images created by Sister Hummel. Rather, it says its rights are derivative from Seem-ann.[5] Seemann, Cambridge alleges, obtained an interest in the United States copyright for Das Hummel-Buch by virtue of her co-author status with Hummel and/or Fink. Cambridge alleges the book was a “joint work” between Hummel and Seemann, and that the copyright in the book therefore granted Seemann rights in all the contents of the book, including Hummel’s illustrations. Cambridge further alleges that Goebel based the designs of at least some of the Hummel figurines on particular images from the book, and not on Hummel artworks of independent provenance. Those figurines, according to Cambridge, represented works derivative of the book. Cambridge, assignee of Seemann’s heirs and half-owner, along with Goebel, of the book copyright, would thus be entitled to half of the proceeds of all exploitation of the book copyright in the United States. From these co-ownership rights, Cambridge argues, it is owed an accounting for Goebel’s profits from the sale of at least some of its figurines and other uses of Hummel imagery in the United States. Goebel has disputed these contentions throughout this litigation.
The district court initially dismissed Cambridge’s suit for want of personal jurisdiction. This court reversed and remanded. Cambridge I, 295 F.3d at 66-68. On remand, the district court again did not reach the merits of Cambridge’s accounting or unjust enrichment claims. Instead, it granted Goebel’s motion for summary judgment on the grounds that the Copyright Act’s three-year statute of limitations barred Cambridge’s suit. Cambridge II, 448 F.Supp.2d at 247; see also 17 U.S.C. § 507(b).
II.
We review de novo the entry of summary judgment in the district court. T-Peg, 459 F.3d at 111. Summary judgment is proper here if the record, read favorably to Cambridge, reflects no genuine issues of material fact and the undisputed facts demonstrate that Goebel is entitled to judgment as a matter of law. T-Peg, 459 F.3d at 111; Fed.R.Civ.P. 56(a).
Cambridge contends on appeal that Massachusetts law governs a claim for accounting for profits, and that consequently the Copyright Act’s statute of limitations does not apply. The issue is more complicated than that. This framing of the argument assumes that the question of ownership had been resolved, by agreement or by a court judgment, before the state-law remedy of accounting was sought. An action brought by a copyright co-owner seeking equitable remedies from another co-owner, even if those remedies are governed by state law, requires that the plaintiff first establish the existence of the right giving rise to the remedy. See, e.g., MacDonald v. Page Co., 251 Mass. 299, 146 N.E. 727 (1925); 1A C.J.S. Accounting § 23 (2007). In the case of an accounting for profits by a co-owner of a copyright where ownership is in dispute, that means the claimant must first establish it has ownership as a predicate to an award of an accounting for profits. The ownership question may be one of state law or of federal law, depending on the *85 facts of a case. In cases involving rights such as those at issue here, plaintiffs usually raise this threshold issue by seeking a declaratory judgment for ownership. See Santa-Rosa, 471 F.3d at 225-26; Royal v. Leading Edge Prods., Inc., 833 F.2d 1, 2 (1st Cir.1987); see also, e.g., Gaiman v. McFarlane, 360 F.3d 644, 648 (7th Cir.2004); Merchant v. Levy, 92 F.3d 51, 53 (2d Cir.1996); Zuill v. Shanahan, 80 F.3d 1366, 1368 (9th Cir.1996); Goodman v. Lee (Goodman II), 78 F.3d 1007, 1009 (5th Cir.1996).
Cambridge’s complaint does not request a declaration of its co-ownership of the United States copyright in Das Hummel-Buch. It both asserts ownership and acknowledges that Cambridge’s ownership is in controversy. The omission does not remove the predicate question of ownership from the case, and whether Cambridge has any ownership interest is in dispute, even on the face of the complaint.
A. Applicability of the Copyright Act
Copyright cases may raise different issues, some of which are controlled by federal law and some of which may refer to and be controlled by state law. We noted as much about this very case in Cambridge I. See 295 F.3d at 64 n. 4 (recognizing that Cambridge’s claims might necessitate reference to “federal copyright law and German contract law as to whether Hummel, Seemann, and Fink are co-owners; Austrian inheritance law if the Seemann rights are disputed; federal copyright law as to whether the figurines are derivative works; and to the law of any of several jurisdictions as to the rights and defenses among co-owners”).
Here the necessary initial question— ownership of copyright interests — is governed by the Copyright Act. Because that question is governed by the Act, the Act’s statute of limitations applies as well. See 17 U.S.C. § 507(b) (“No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued.”). It would be anomalous and, we think, contrary to congressional language and intent not to apply the Act’s limitations period when the Act governs the question of ownership interest.
Our view that a single copyright case can raise different issues governed by different laws is well accepted. In an instructive if not directly parallel case, the Supreme Court addressed the applicability of federal and state law in actions asserting copyright interests. In De Sylva v. Ballentine, 351 U.S. 570, 76 S.Ct. 974, 100 L.Ed. 1415 (1956), the mother of the illegitimate child of a deceased composer sued for a declaratory judgment that the child possessed an interest in the renewal copyrights of the composer’s works; the mother also sought an accounting for past profits. Id. at 571-72, 76 S.Ct. 974. The ownership determination hinged on a provision in the Copyright Act, then in effect, which was ambiguous on two issues: whether children of authors could inherit copyright renewal rights during the lifetime of the author’s widow; and whether “children,” as used within the Copyright Act, included illegitimate offspring. Id. at 572, 76 S.Ct. 974.
The Court held that “[t]he scope of a federal right is, of course, a federal question,” and interpreted the ambiguous Copyright Act provision to resolve the ownership issue. Id. at 580, 76 S.Ct. 974. The Court did reference state law in the course of construing the Act. As to the discrete issue of whether the term “children” included illegitimate offspring, the Court noted that “there is no federal law of domestic relations, which is primarily a matter of state concern.” Id. Because the federal Act did not address the issue at *86 hand, which was “really a question of the descent of property,” the Court looked to the California Probate Code, the source of law that would govern descent of the composer’s estate, to give content to the term “children” as used in the Copyright Act. Id. at 581-82, 76 S.Ct. 974.
The current Copyright Act treats determinations of the rights at issue here as questions of authorship status and initial ownership of copyrights. Section 101 of the current Act expressly defines terms such as “copyright owner,” “joint work,” and “work made for hire.” 17 U.S.C. § 101. Section 201 of the Act explicitly controls vesting of copyright in authors; sets out the ownership status of authors and co-authors of joint works; and establishes copyright ownership by employers who commission works made for hire. 17 U.S.C. § 201. There is a substantial federal interest in having the federal statute of limitations applied to these determinations.
Indeed, the Act also contains a provision that expressly preempts state common-law copyright protection and all other “legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright....” 17 U.S.C. § 301(a). That provision, while by its terms governs the preemption of causes of action, presupposes the existence of “legal or equitable rights” which are, in turn, defined elsewhere in the Act.
Our concern is thus not, as Cambridge suggests, with whether the Act preempts a state accounting cause of action. That is a hypothetical question on the facts of this case, and we do not give advisory opinions. Our concern is only with whether the federal statute of limitations applies to the prerequisite issues of ownership which are governed by the Act.
 All of the federal circuit courts of appeal that have addressed the issue, including this one, agree that a determination of copyright ownership based on a disputed allegation of co-authorship presents a federal question that arises under, and must be determined according to, the Copyright Act. See Santa-Rosa, 471 F.3d at 227; see also, e.g., Gaiman, 360 F.3d at 652-53; Merchant, 92 F.3d at 55-56; Goodman II, 78 F.3d at 1010.[6] Where an ownership claim arises under the Copyright Act, the Act’s three-year statute of limitations likewise applies. Gaiman, 360 F.3d at 653; see also Santa-Rosa, 471 F.3d at 227; Merchant, 92 F.3d at 56. Some cases address the question in the context of performing an “arising under” analysis to determine whether there is federal jurisdiction. See, e.g., Merchant, 92 F.3d at 55; see also Royal, 833 F.2d at 2-3 (adopting test for original federal subject matter jurisdiction in T.B. Harms v. Eliscu, 339 F.2d 823 (2d Cir.1964)). Here, there is diversity jurisdiction, but the question of whether there is a federal question under the Copyright Act as to the prerequisite of co-ownership .involves parallel reasoning.
Cambridge attempts to avoid this conclusion by arguing that “the Act’s limitations do not apply to actions for accounting between co-owners.” As we have *87 said, that is not the issue. Cambridge argues that it is the fact that the action is one which the complaint labels as being for an accounting that makes the difference.[7] If co-ownership were conceded and the only question was a claim for accounting of profits from the other joint owner, then Cambridge could argue the suit was only for an accounting of profits under state law. Gaiman, 360 F.3d at 652. But under a long line of federal cases, Cambridge must first establish that it is a co-owner, and the answer to that lies in the application of the Copyright Act and subjects that claim to the Act’s statute of limitations. See id. at 652-53. Cambridge cannot avoid this by the stratagem of failing to ask for a declaration of ownership as a method of avoiding the federal limitations period for an ownership claim governed by the federal Act.[8]
Cambridge cites Goodman II, 78 F.3d 1007, as support for its argument. That case does not support Cambridge’s position; it does support our view of the case. In Goodman, a musician sued the heirs of her former performing partner for a declaration of co-authorship and an accounting for royalties from the song “Let the Good Times Roll.” Goodman v. Lee (Goodman I), 815 F.2d 1030, 1031 (5th Cir.1987). The district court granted defendants’ motion for summary judgment for lack of subject matter jurisdiction. Id. The Fifth Circuit reversed “[bjecause ... exclusive federal district court jurisdiction exists in an action for a declaratory judgment to establish joint authorship of a copyrighted work....” Id. at 1032.
After trial, the Goodman jury found that the plaintiff “was a co-author of [the song]” and that her claim was timely because “she ‘did not know or should not have known’ ” until the year before filing suit that her co-author had listed himself as the sole author on the copyright registration. Goodman II, 78 F.3d at 1010. Only after the co-authorship issue was resolved did the court address the issue of an accounting.
On appeal in Goodman, the defendants contested the district court’s remedial award of an accounting. The Fifth Circuit held that the remedy of an accounting did not itself present any federal questions, unlike the resolved predicate question of ownership, and that Louisiana law, including the state statute of limitations, governed the accounting issues. Id. at 1012-13.
The Goodman decisions are entirely consistent with the prevailing view that disputed claims about whether there is co-authorship require application of the *88 Copyright Act and the Act’s statute of limitations. The portion of the opinion that applied state law is inapposite here, because it dealt with accounting issues that only arose following a proper determination of copyright ownership under the Copyright Act. Cambridge has not cleared that hurdle of establishing ownership.[9]
The controversy over Cambridge’s copyright interests directly involves Seem-ann’s authorship status and her initial ownership of the copyright in Das Hum-mel-Buch, as well as the effect of various registration documents and transfers. The Copyright Act clearly covers these issues. See 17 U.S.C. §§ 101, 201, 204-05, 410. We hold as a matter of law that on the facts of this case, Cambridge’s allegations of co-ownership present an issue subject to the Copyright Act and that the Act’s three-year statute of limitations applies to that issue, which must be resolved before the issue of an accounting arises.
B. Application of the Act’s Accrual Rules to These Claims
The Copyright Act bars lawsuits premised on a copyright claim brought after three years from accrual of that claim. 17 U.S.C. § 507(b). A claim accrues when a plaintiff “knows or has reason to know of the act which is the basis for the claim.” Santa-Rosa, 471 F.3d at 227 (internal quotation omitted). If Cambridge’s claims accrued earlier than February 24, 1997, three years before Cambridge filed the present suit, the suit is barred.
In Santa-Rosa, we applied the accrual test to a 2004 suit by a renowned salsa musician requesting a declaration of co-ownership in several recordings he allegedly co-authored in the mid-1980s. 471 F.3d at 225-26. We affirmed dismissal of the suit as time-barred. Id. at 228.
Santa-Rosa held that the plaintiff knew or should have known of the basis for his claim to co-authorship of the songs at the moment of their creation. Id. After all, “ ‘[a] co-author knows that he or she jointly created a work from the moment of its creation,’ ” and thus would have been aware at that time of a claim for co-ownership. Id. (quoting Merchant, 92 F.3d at 56); cf 17 U.S.C. § 101 (defining “joint work” as “a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole” (emphasis added)). “Thus,” Santa-Rosa reasoned, “there is little question that [plaintiffs] claims for co-ownership accrued as soon as he finished recording each album.” 471 F.3d at 228. In Santa-Rosa the claimant was the co-author, and not an heir.
Santa-Rosa acknowledged, however, that other courts have applied the accrual test differently. For instance, the Ninth Circuit has held that a claim for a declaration of ownership under the Copyright Act does not accrue until “a ‘plain and express repudiation of co-ownership is communicated to the claimant.’ ” Id. (quoting Zuill, 80 F.3d at 1369). Even under this more claimant-friendly standard, however, the Santa-Rosa plaintiff could not prevail, because there was plain and express repudiation of co-ownership from the fact that the defendant record company “openly, and quite notoriously, sold [plaintiffs] records without providing payment to him” more than three years before the plaintiff filed suit. Id.
*89 Under the reasoning of Santa-Rosa, the accrual inquiry in this case would initially be directed at Margarete Seemann and her knowledge of potential ownership claims in the 1930s. If, as Cambridge claims, Seemann had co-authored Das Hummel-Buch as a joint work, she would by definition have been aware of her status as joint owner of the book and all of its contents. Seemann also conceivably received notice of a repudiation of her ownership status when Goebel began marketing Hummel figurines in the 1930s and failed to pay Seemann any royalties. Under a literal reading of Santa-Rosa, Seem-ann’s claims for a declaration of co-authorship of the book would have accrued long before her death in 1949.
The Santa-Rosa model for accrual does not work well here because the Copyright Act did not contain a statute of limitations for civil actions until 1957. See 3 M. Nim-mer & D. Nimmer, Nimmer on Copyright § 12.05[A] (2007). We also do not reach the question of whether the claims based on Seemann’s work accrued within three years after a statute of limitations was added to the Copyright Act. Instead, we ask whether any claims held by Cambridge and/or the assignors of the rights Cambridge alleges descended from Seemann accrued before the case was brought.
1. The Romanowicz Assignment
Maria Romanowicz, Seemann’s heir in Vienna, assigned whatever rights she may have had in the book’s United States copyright to Cambridge by September 6, 1995. We do not address whether Romanowicz’s rights were time-barred at that time.
Cambridge did not file suit within three years of acquisition of those rights, and based on its knowledge at the time, the claim is barred. Cambridge was on notice of a repudiation of those rights by the time of the assignment. Herrmann, Cambridge’s sole shareholder and negotiating adversary to Romanowicz, was privy to the Schmid-Goebel settlement agreement stipulating that those two companies owned all rights to the book in the United States. Moreover, Herrmann knew that Roma-nowicz was not receiving royalties from Goebel on the sale of Hummel figurines.
The most cogent evidence of accrual is Cambridge’s own motivation for approaching Romanowicz. What Cambridge sought to purchase was essentially a cause of action against Goebel. Cambridge was aware of whatever potential claims against Goebel the purchase would bolster, and even ensured that the assignment contract specified a transfer of any and all claims for accountings under United States law. With respect to the Romanowicz assignment, the statute of limitations under the Copyright Act started running against Cambridge no later than September 1995. Because there was no tolling (as we explain below), section 507(b) of the Copyright Act barred Cambridge’s claims based on the Romanowicz assignment before this suit was filed in 2000.
2. The Cermanovic-Kuzmanovic Assignment
On the undisputed facts, Dr. Alexandrine Cermanovic-Kuzmanovic, Margarete Seemann’s heir in Belgrade, knew — or reasonably should have known— about the basis for a claim of co-ownership of the United States copyright to Das Hummel-Buch before February 1997. In making this determination, we do not decide whether Seemann co-authored the book, whether Goebel’s figurines were derivatives of the book, or whether any rights that descended from Seemann to the heirs entitled the heirs to share in profits derived from sales of the figurines. The accrual test looks to the existence of a claim, not its resolution.
*90 Herrmann first contacted Cermanovic-Kuzmanovic’s attorney in Vienna, Dr. Theodor Petter, in 1995. Petter referred Herrmann directly to Cermanovic-Kuzma-novic to discuss an assignment of copyrights. Herrmann testified that in a conversation that same year, Cermanovic-Kuzmanovic indicated that “she was very interested in gaining some income based upon an assignment of her American rights.... ” She referred Herrmann back to Petter, and the two attorneys commenced negotiations.[10] At that time, Cer-manovic-Kuzmanovic knew she was not receiving any payments on any inherited co-author ownership right in Das Hum-melr-Buch. She also was aware that Fink had not paid her royalties on the original German book, in contrast with Fink’s payment until 1973 to the heirs of royalties on an English-language The Hummel Book.[11]
Starting at the latest in 1995, when she was contacted by Herrmann, Cermanovic-Kuzmanovic had every motivation to ascertain the existence and potential value of her rights in the book, and she had counsel in Vienna to assist her in that task. Yet she did not bring suit within three years, even though readily available inquiries would have revealed numerous repudía-tions of the “rights” Cambridge sought to purchase.
There were a number of different signs of repudiation, which in total require the conclusion that the claims had accrued. Publicly available documents in the United States Copyright Office raised issues about Seemann’s purported ownership of Das Hummel-Buch. First, the original 1936 application for a United States copyright in the book lists the publishing house Emil Fink Verlag as the “copyright owner.” Second, the 1962 application for the renewal copyright lists the publisher as “proprietor of copyright in a work made for hire.” Third, a 1971 transfer document, recorded in accordance with 17 U.S.C. § 205, expressly names Fink as owner of the copyright and describes an assignment of the copyright to Goebel. Fourth, due diligence, including questions to Cambridge, may well have led to information about the litigation which resulted in the 1992 Consent Decree. There is another point as well. Cermanovic-Kuzmanovic openly expressed to Herrmann when he telephoned her in 1995 that she was interested in obtaining income from whatever rights she might hold.
Beyond that, if Cermanovic-Kuzmanovic indeed possessed a joint interest in the *91 book’s United States copyright as an heir to Seemann, then she would have been entitled to the exclusive right “to prepare derivative works based upon the copyrighted work.” 17 U.S.C. § 106(2). Goe-bel, meanwhile, had been “openly[] and quite notoriously” exploiting works for decades that appeared in Das Hummel-Buch.[12] Santa-Rosa, 471 F.3d at 228. At least one of Goebel’s much-used and apparently profitable images appears in Das Hummel-Buch. Cambridge’s complaint points out that Goebel has “for decades utilized, in a particular and crucial fashion, one specific picture ... popularly known as ‘The Merry Wanderer,’ ” which “ ‘ultimately became the symbol for the entire M.I. Hummel line.’” Yet Goebel never paid the heirs for its use of The Merry Wanderer.[13]
The sum, by 1995, of all of this was to start the limitations period running. Publicly available documents in the Copyright Office and prior litigation cast doubt on Cermanovic-Kuzmanovie’s rights in Das Hummel-Buch. Moreover, Goebel engaged in widespread exploitation of at least some portion of those rights, such as its use of The Merry Wanderer, without remuneration to Cermanovic-Kuzmanovic. Such circumstances constituted a “plain and express repudiation” of Cermanovic-Kuzmanovic’s purported co-ownership rights in Das Hummel-Buch sufficient to trigger the Copyright Act’s three-year statute of limitations. Santa-Rosa, 471 F.3d at 228 (internal quotation omitted).
Whether Seemann co-authored Das Hummel-Buch or not, the right to contest that status lay with the poet’s heirs until they assigned them to Cambridge. Cermanovic-Kuzmanovic did not file suit by 1998. Cambridge did not resurrect that claim by purchasing an assignment from Cermanovic-Kuzmanovic in 1999. “[A]n assignee cannot maintain a claim in the face of a limitations defense that would have trumped the same claim had it been brought by the assignor.” Young, 305 F.3d at 17.
3. Tolling
Cambridge argues that a “legal disability” tolled the statute of limitations against its claims based on the assignment from Romanowicz in 1995. Cambridge could not have filed this case until 1999, it claims, because “until then the sole basis for alleging Goebel’s exploitation was documents classified as ‘SECRET’ by a federal court in another earlier matter-the content of which [Herrmann] was duty bound not to disclose.”
Cambridge’s position, even taken on its own terms, is baseless. Just as all the reasons we have outlined would have put Cermanovic-Kuzmanovic on notice of a repudiation of Seemann’s status as co-author, those reasons provided more than adequate grounds for Cambridge to allege that Goebel had prepared works derivative of the book. Cambridge need not have relied on any documents under protective order to file this lawsuit. There was no *92 tolling of Cambridge’s claims based on the Romanowicz assignment.
We affirm summary judgment in favor of defendants. Costs are awarded to defendants.

. Not all claims of co-ownership will arise under the Copyright Act, and our decision does not affect such cases. For example, at times, whether there is co-ownership may be determined by the terms of a contract governed by state law or through other ownership interests governed by state law and thus not require application of the Copyright Act. See, e.g., Royal v. Leading Edge Prods., Inc., 833 F.2d 1, 4-5 (1st Cir.1987) (rejecting federal question jurisdiction where claim of co-ownership, "in its very nature and essence, [was] one for breach of contract” under state law). In other cases, such as where co-ownership results from purported statutory co-authorship, the question of co-ownership is governed by the Copyright Act. See 3 M. Nim-mer & D. Nimmer, Nimmer on Copyright § 12.01[A][1][b] (2007) (endorsing view that in an action seeking declaratory judgment of plaintiff as co-author and for an accounting, federal jurisdiction is exclusive because "copyright ownership by reason of one's status as co-author arises directly from the terms of the Copyright Act itself”); see also Gaiman v. McFarlane, 360 F.3d 644, 652-53 (7th Cir.2004) (collecting cases).

. We do not hold, nor is it a ramification of our holding, that federal courts have exclusive subject matter jurisdiction to adjudicate all accounting claims between the co-owners of a copyrighted work.

. The complaint states that the District of Massachusetts "has diversity jurisdiction ... pursuant to [28 U.S.C. § 1332(a)]” and "[further, if this action were determined to be arising under Federal copyright statutes, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338.” Am. Compl. ¶¶ 16-17.

. At the same time, however, the complaint concedes that Goebel and other parties had previously asserted the ownership rights to the United States copyright in Das Hummel-Buck without ever acknowledging any ownership interest by Seemann or her heirs. See, e.g., Am. Compl. ¶¶ 44-45 ("Goebel, claiming as alleged owner of the Book Renewal ... has previously, in a United States District Court, made claim for alleged infringement of the Book Renewal.”); id. ¶ 66 (alleging that a 1992 federal court consent decree named Schmid and a Goebel subsidiary “undivided joint owners of the Book Renewal”). Similarly, the complaint reveals that Goebel had previously represented the contents of the *84 book as "works for hire” rather than "joint works,” which would mean that even if Seem-ann held the copyright in her poems, her rights would not extend to Hummel’s illustrations. Am. Compl. ¶ 44.

. At no time has Cambridge alleged that Goe-bel exploited Seemann's written contributions to Das Hummel-Buch.

. Nothing in our decision in Royal is inconsistent, contrary to Cambridge’s argument. In Royal, we upheld dismissal of a claim for declaration of copyright ownership because that claim did not create federal question jurisdiction. 833 F.2d at 2. Here, jurisdiction is not at issue. In addition, the Royal claimant's theory of ownership turned not on his status as a co-author, but on an alleged breach of a royalty agreement between the claimant and his employer. Id. at 1-3. Because “[the claimant's] assertions gr[e]w out of his purported contract rights,'' state law controlled their resolution and failed to create federal subject matter jurisdiction. Id. at 3.

. Our holding is that the federal period of limitations, and not a state limitations period, applies to the predicate question of co-authorship rights, which is governed by the Copyright Act. We see no need to address the defense of preemption raised by Goebel, see 17 U.S.C. § 301, or Cambridge’s argument that there is no preemption. In particular, Cambridge argues that a grandfathering provision saves the accounting claim from preemption because it involves "undertakings commenced before January 1, 1978,” i.e., Goebel's exploitation of Hummel imagery from 1935 to the present. Id. § 301(b)(2). Our holding rests on the fact that the issue of ownership must be addressed first and is controlled by the Copyright Act’s limitations period. This is true whether or not the claim for an accounting under state law is preempted.

. If Cambridge is arguing that the grandfathering clause in section 301(b)(2) somehow makes the co-authorship issue not an issue of federal law under the Act, then Cambridge is wrong. By its own terms, section 301(b) is limited in its application only to "rights or remedies under the common law or statutes of any State.” Id. § 301(b). Pre-1978 claims of co-author status are governed by the Copyright Act of 1909. Cf. De Sylva, 351 U.S. at 580, 76 S.Ct. 974.

. The question of whether a claim for an accounting for profits realized from exploitation of a jointly-owned copyright-once that ownership is established-is subject to state-law limitations is not one that we need decide. See supra note 7.

. Petter died soon thereafter. In 1996, Pet-ter’s daughter, Dr. Elizabeth Fetcher-Petter, took over her father's law practice and resumed negotiations with Herrmann. Fetcher-Petter described those negotiations as “productive but extremely lengthy”; the assignment from Cermanovic-Kuzmanovic to Cambridge was finally executed on February 9, 1999.

. A stipulation between the parties indicates that Fink paid book royalties to the heirs until 1973. Cambridge argues that "[tjhese payments constituted an affirmation of [Cerma-novic-Kuzmanovic's] interests [in the book] both by Fink and [Goebel]....” Cambridge’s argument fails. The stipulation states that Fink paid royalties to Seemann and her heirs for sales of The Hummel Book, the English translation of Das Hummel-Buch. The 1934 contract between Fink and Seemann treated these as two separate properties. Fink was to pay Seemann three lump sums in 1934 for the use of her poems in Das Hummel-Buch. Fink could, according to the contract, prepare translations of the German book only by mutual agreement with Seemann, and the poet would receive a 4% royalty on the retail price of any translated books. As a translation, The Hummel Book itself is a derivative work, the ownership of which "does not imply any exclusive right in the preexisting material.” 17 U.S.C. §§ 101, 103. Any rights in a translation of Das Hummel-Buch would therefore not extend to any of the images contained in the original German edition.

. Goebel does not argue that the mere manufacturing and marketing of Hummel figurines put the heirs on notice, regardless of the heirs' knowledge of the source for the figurines.

. Cambridge argues that the apparent repudiation of any rights held by Seemann in The Merry Wanderer and other images from Das Hummel-Buch was insufficient because Seemann's heirs could not possibly have known for certain that Goebel was exploiting derivatives of the book. Cambridge maintains this is so because Goebel, if asked, would have denied that it was exploiting derivative works. The heirs, as with any other rights-holder with a potential claim, need not have obtained an admission of liability from Goebel in order for accrual to occur.